**BEFORE THE UNITED STATES
JUDICIAL PANEL ON
MULTI DISTRICT LITIGATION**

**In re** Solar Power Deceptive Sales and Financing Litigation            MDL-  _____

:

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR
TRANSFER OF ACTIONS PURSUANT TO 28 U.S.C. § 1407**

Pursuant to 28 U.S.C. § 1407 and Rule 7.2(a) of the Rules of Procedure of the Judicial

Panel on Multidistrict Litigation, Neda Yarnall, Cheryl Hibbard, Mark Hibbard, Madelene Funk,

Christoper Funk, Tatiana Mykyta Polanin and Hector Chaverra plaintiffs in the putative class

action *Yarnall, et. al. v. Fifth Third Bank, N.A.,* No. 2:24-cv-07244, (D.N.J.) (Julien Xavier Neals,

J. and James B. Clark., M.J.) ("Plaintiffs" or "Yarnall Plaintiffs"); respectfully submits this brief

in support of their motion requesting that all currently-filed cases identified in the Schedule of

Actions ("Actions"), as well as, any cases subsequently filed involving similar facts or claims ("tag

along cases") (collectively, "Related Actions"), be transferred to the United States District Court

for the District of New Jersey for centralized and coordinated pretrial proceedings.

Presently, there are five actions pending in several judicial districts in the United States

alleging similar wrongful conduct on the part of Fifth Third Bank, N.A., ("Defendant" or "Fifth

Third") and their related and/or predecessor entities, Dividend Solar Finance, LLC and Dividend

Finance Inc. ("Dividend Defendants")[1].  As discussed below, these actions all involve alleged loan

---

[1] Defendant Firth Third and Dividend Solar Finance, LLC. explain in their Memorandum of Law
in Support of Motion to Stay Case pending Resolution of Motion in Related Action In the District
of Connecticut ("Defendant's Motion to Stay in N.J.") that "[i]n 2022, Firth Third's parent
corporation acquired Dividend, which has since merged into Fifth Third" *Yarnall, et. al. v. Fifth
Third Bank, N.A., No. 2:24-cv-0724 (D.N.J.)* Doc. No. 11-3 at 2, fn.2

1

agreements between consumers and Fifth Third, for the purchase and installation of residential solar power systems that were secured through deceptive business practices.  These solar power finance agreements were sold throughout the United States. It is likely that additional similar actions will be filed in additional jurisdictions across the country.  Transfer for consolidation and coordination is proper because each of the Actions and tag along cases arise out of the same or similar nucleus of operative facts, arise out of the same or similar alleged wrongful conduct, will involve the resolution of the same or similar questions of fact and law, and discovery will be substantially similar and will involve the same documents and witnesses.

All of these actions are in their infancy and none of the actions have commenced discovery.

BACKGROUND:

Dividend Solar Finance LLC ("Dividend") is a Delaware limited liability company with its principal place of business at One California Street, Suite 1500, San Francisco, CA 94111.  Dividend Finance Inc, is a Delaware corporation with its principal place of business in California and wholly owned by Fifth Third Bank, N.A.  Fifth Third Bank, N.A is a national bank with its principal place of business at 38 Fountain Square Plaza, MD 10907F, Cincinnati, OH 45263

In New Jersey and throughout the country, rather than advertise directly to consumers, Fifth Third Bank, then operating as Dividend, partnered with solar companies, including Vision Solar LLC ("Vison Solar")[2], to feature Defendant's loans as part of "sales proposal" or "custom proposal" presented to potential customers as the way to pay for their purchase.  These sales proposals were integral to the sale process for the securing the alleged loan.

---

[2] Vision Solar LLC is a limited liability company with its principal place of business at 511 Route 168, Blackwood, New Jersey 08102.

The presentations by Defendant's solar power partners relied on deceptive sales tactics; including: a) creating confusion about sellers' affiliation with utilities; b) overpromised savings; c) false promises about the suitability of the home for the cost-effective utilization of solar panels; d) failing to disclose or misrepresenting the length of time and steps necessary to install, inspect and activate the system, including the necessity of securing local permits necessary before installation; e) false promises about the availability of tax credits and other incentives; f) misrepresenting to potential customers that their signatures secured by sales representatives via tablet devices during home visits were for credit approval as opposed to loan activations; g) remaining in customers' homes for hours to secure signatures; and h) misrepresenting in loan documents the true cost of financing by including the true cost of financing which includes an upfront financing fees that is not disclosed in the APR presented to consumers.

As far back as November 2022, nine state attorneys general notified Defendant of concerns regarding alleged violations of consumer protection laws around the sale of solar systems financed by Defendant[3]. The Consumer Financial Protection Bureau has received numerous complaints (as early as November 2022) complaining of improper practices of Defendant and its solar partners.

Plaintiffs allege that the Defendant knew, or were reckless in not knowing, as early as 2022, that their loans were a product of deception and fraud. Moreover, it is alleged that the Defendant undertook active and ongoing steps to conceal the true financing costs to the consumer and the

---

[3] Buckel, Krista. "Attorney General Cameron Leads Nine States in Urging  Five Solar Lending Companies to Suspend Finance Obligations for Pink Energy Customers"  (November 22, 2022) https://www.kentucky.gov/Pages/Activity-stream.aspx?n=AttorneyGeneral&prId=1287#:~:text=(November%2022%2C%202022)%20%E2%80%93,Pink%20Energy%20customers%20until%20the

(last accessed July 29, 2024)

true facts regarding the ability of the solar power system to pay for monthly costs of financing, and has consciously withheld material facts from Plaintiffs and other members of the putative class with respect to the true nature of saving to be achieved through solar power and the true financing costs of the loan.

Defendant's conduct was objectively deceptive and had the capacity to deceive reasonable consumers under the circumstances. The fact that solar panels could not achieve the generation of power represented to customers; could not be installed and certified early enough for the consumer to take advantage of an early installment payment to significantly reduce the monthly amount of the loan payment; could not qualify for the level of tax incentives as promised at the time of sale; and that the loan included a hidden upfront finance fee were all material facts that a reasonable and/or unsophisticated consumer would attach importance to at the time of purchase. These facts would influence a reasonable consumers' chose of action during the purchase of their solar system along with its financing.

Defendant intended that the Plaintiffs and other members of the putative class would rely on its acts of concealment and omission to focus them into the purchase of a loan with fees significantly higher than that of competitors.

As a consequence of Defendant's false and misleading statements and active and ongoing concealment, Plaintiffs and the putative Class Members have incurred damages.

PLAINTIFFS' EXPERIENCE WITH DIVIDEND:

<u>Ms. Yarnall</u>

Ms. Yarnall is a citizen of the State of New Jersey who was surreptitiously entered into a loan agreement without her permission after Defendant's sales partner represented that he was only seeking pre-approval status of a loan ($42,428) and that Ms. Yarnall could pay cash ($25,000)

for the system upon its installation, thus eliminated the need for financing. Ms. Yarnall's direct communications with Dividend confirmed this understanding. It was also represented by Dividend that if Ms. Yarnall decided to secure a loan, she would receive a tax credit that could be paid towards the loan, thus maintaining a low monthly loan payment amount. Thereafter, Ms. Yarnall received an email informing her that the installation was completed when it was not and when she communicated that fact to Defendant, they indicated they had already released the funds that she still owed on the loan and the Defendant hung up the phone. Meanwhile, the incomplete installation was defective causing her roof to leak; the plans submitted to the town were incorrect and she learned that necessary permits from the municipality had not been granted prior to the start of the installation or prior to the release of funds by Defendant.

The Hibbards

Plaintiffs Mr. and Mrs Hibbard are residents of New Jersey, who were surreptitiously entered into a loan agreement after Defendant's partner, a solar company representative told them that certain screens Mr. Hibbard initialed on the sales representative's table were for pre-approval for credit only. The salesperson discussed an amount of $18,000 and the costs for a proposed loan would be paid from the electricity savings and tax credits. However, when electronic screens were shown to Mr. Hibbard, nowhere did a dollar amount appear. Quickly thereafter, workers showed up to install the panels, but there was no further loan information. When the Hibbards checked their credit score, they discovered a loan for $62,00. Immediately upon learning of this, they called the sales representative for the solar company and then the Defendant to cancel the loan, but Defendant failed to do so. The installation that was done failed inspection twice and did not begin to produce any electricity until some eight (8) months later. The panels never produced the amount of electricity that was promised by the sales representative and to even achieve any savings, it

5

required the removal of two trees which the representative had previously promised would not be necessary to achieve the electrical output that had been promised.  When the Hibbards attempted to sell their home, the purchaser backed out of the deal because they refused to take over the purported loan.

<u>The Funks</u>

Plaintiffs Christopher and Madelene Funk are residents of Wolcott, Connecticut. In or about January 2023, the Funks were surreptitiously entered into a loan agreement when they were told that the information being entered into the Sales representative's tablet was for pre-approval of credit only. Initially, Mr. Funk received a phone solicitation from an individual who represented himself as coming from Eversource (the Connecticut utility company) and who was interested in setting an at home appointment to discuss solar power.  Mr. Funk advised that they had decided against solar power because they were informed their lot was too wooded to make it cost effective. The representative insisted it would work and that Eversource was required to do 20% of solar power a year and his house had been picked.  Mr. Funk agreed to meet with the representative.  A representative did appear on the designated date and time but indicated that he was not from Eversource but was contracted by Eversource.  It was later revealed from a call to Eversource that this was a misrepresentation.

The salesperson, who was from Dividend's solar power partner, Vision Solar, stayed for approximately five (5) hours.  He did an inspection around the exterior and interior of the house, asked to see utility bills for a year and then got out his tablet and did a calculation as to the number of kilowatts that the advertised system would generate with the aim of getting to 110% of power generated from solar.  Next, he entered information to get a credit score and said he was seeking to pre-qualify Mr. Funk for a loan.

Mr. Funk specifically expressed that he was not interested in financing in that he could secure same through his credit union. Despite this, the salesperson, noted that Mr. Funk could not get a 2.99 APR elsewhere and that the inputting of Mr. Funk's financial information was only for pre-credit approval. The salesperson further advised that the loan would cost $234.00 per month for the life of the loan if Mr. Funk would pay the solar rebate he received back to the lender. The salesperson indicated the rebate would be $7,500.

The salesperson pulled up a type of agreement on his tablet and wanted Mr. Funk to initial at the bottom of several screens. Mr Funk advised that he could not comprehend the language on the screens, nor could he enter his signature because he was disabled with dyslexia. Regardless, the representative entered the data and his initials claiming it was for pre-approval for credit only. Thereafter, the Funks were not provided with any written copy of the document(s) that he viewed. It was not until months later, in late April, early May, after the panels were placed on his roof, when he contacted Dividend that he was advised that he had entered into a loan. He immediately tried to cancel but was refused.

The installation of the solar system was flawed from the start, precluding the system from becoming operational. Despite this, Dividend paid the installer. These defects included installing the electrical box in the wrong place and not having an electrician present during the installation, When Mr. Funk reported this, it was revealed that it appeared that an assessment of his house for solar power had actually been performed on the wrong house, further complicating whether the promises made about electrical output were based upon calculations made on his home. Mr. Funk made calls to both Vision Solar and Dividend, demanding a re-assessment and resolution. While Dividend agreed to "fix" the issues around the solar system installation, in truth, the contractor who was to assist, indicated he was not hired to do a re-assessment and negotiations broke down,

but Dividend still demanded payment.

Thus, the Plaintiff Funks are left with an inoperable solar system despite scores of efforts at resolution over the past eighteen (18) months.

Ms. Polanin

Plaintiff Tatiana (Mykyta) Polanin is a resident of Northvale, New Jersey. In or about mid-June 2023, Ms. Polanin was surreptitiously entered into a loan agreement with Dividend when she was told that information being entered into a sales representative's tablet was for pre-approval of credit only. He promised that should she decide to finance the solar panel system, the monthly payments would be $50 per month and that she would receive incentives from the government of approximately $8,000 which would allow the payment of the loan to remain the same throughout the life of the loan. The representative took financial data from her and entered it into a tablet and told her she was pre-approved and directed her to just sign a screen, advising her that it was <u>not</u> a contract, just an estimate.   When Ms. Polanin expressed discomfort in signing anything, the representative reassured her that she was <u>not</u> entering a contract and entering her name onto the screen would only guarantee the price he was quoting to her.  She reluctantly entered her name on various screens, but the language that was presented to her on the various screens was blurred out. The sales representatives were at her house from approximately 10 a.m. to 5 p.m.   The representatives never said anything about loan documents; she never received anything else in the mail; and they never discussed when payments would start. Sometime later, when she was reviewing her emails, she saw an email from Dividend.  The email indicated that she should review the attached documents and sign, but the document attached had already been signed. The document (purported contract) differed from what she had been told in that the monthly payment was $146.29, more than her monthly electricity bill.  The total amount of the alleged loan was

$26,955. The incentive payment she understood she would receive from tax incentives was $8,086.50. She called immediately and sought to cancel and was advised there was nothing she could do about it, that it was too late. Thereafter, an installer appeared at her house absent notice. She again expressed dissatisfaction with the proposal and installation and further questioned whether permits were needed to install the panels. The installer told her not to worry. Thereafter, she received a violation notice from her town, seeking to charge her $2,000 for an installation that lacked permits. This began an endless process of Ms. Polanin making continuous phone calls in an effort to extricate herself from the purported contract and the system that had been installed without permits. To date, Dividend had not proposed an acceptable solution and Polanin has received an estimate from an independent contractor of $5,000 to remove the panels.

<u>Mr. Chaverra</u>

Plaintiff Hector Chaverra is a resident of Toms River, New Jersey. In or about late May 2022, Mr. Chaverra was surreptitiously entered into a loan agreement without his permission after Dividend's sales partner, represented he was only seeking pre-approval for credit only.

The salesperson from Vison Solar, which was Dividend's solar power partner, promised that ultimately if he had a solar system installed, he would only have to pay approximately $35 monthly, as he would receive both state and federal incentives. Moreover, he was promised that even before the system was made operational, the panels would store electricity so that when the panels came online, the stored electricity would be useable. The representatives even promised there would be excess electricity that he could sell back to the utility company. When the installer came, Mr. Chaverra asked about permits and was told, don't worry about that. Once the panels were installed, they remained inoperable for approximately six months, despite calls he made multiple times per week over six months to follow up on trying to make the panels operational.

9

Mr. Chaverra' s panels did not perform as promised and he is paying the electric company between $100.00-$200.00 per month.  For the last year he has also been stuck paying Dividend monthly on a loan of approximately $32,000.

ARGUMENTS:

I.      THE PANEL SHOULD TRANSFER ALL THE CASES FOR CONSOLIDATED <u>PROCEEDINGS</u>.

Consolidation of all Actions is appropriate here. Transfer for coordinated or consolidated pretrial proceedings is appropriate where: (1) the actions involve "one or more common questions of fact" and law; and (2) consolidation will be for the "convenience of parties and witnesses and will promote the just and efficient conduct of such actions." *See* 28 U.S.C. § 1407(a). Here, all of the cases involve common questions of fact relating to the Defendant's deceptive and fraudulent actions in entering into alleged finance arrangements with consumers for the installation of residential solar power which caused significant damage to Plaintiffs. Additionally, transferring these Actions for consolidated pretrial proceedings will significantly reduce the burden on the federal courts, the parties, and the witnesses involved. Manuel for Complex Litigation (Fourth) §20.131 (2004); see also <u>In re General Motors Corp. Piston Slap Prods. Liab. Litig.</u>, 314 F. Supp. 2d 1386, 1388 (J.P/M.L. 2004)(transferring actions and stating that "[c]entralization under Section 1407 is necessary in order to eliminate duplicative discovery, prevent inconsistent pretrial rulings (especially with respect to class certification matters), and conserve the resources of the parties, their counsel and the judiciary"); <u>In re Amazon.com, Inc</u>., MDL No. 2527, 2014 WL 1364747, at *1 (J.P.M.L. April 8, 2014)(same).

Without transfer, the federal court system will be forced to administer – and the parties will be forced to litigate – many similar actions on different pretrial schedules. The Actions allege

similar legal claims and necessarily require overlapping factual inquiries. Discovery in each will require much of the same information from the Defendants and the predecessor entities. Transferring the Actions to a single judge will preserve judicial resources by avoiding the need for federal judges in multiple districts, to address identical legal issues and similar factual patterns.

In addition, centralization of class actions are proper even if only a few cases are filed in different districts. See, e.g., In re Charlotte Russe, Inc., Fair & Accurate Credit Transactions Act (FACTA) Litig., 505 F. Supp. 2d 1377, 1378 (J.P.M.L. 2007) (holding that centralization of two cases was appropriate). Here, five cases have already been filed four different Districts.

II.     THE DISTRICT OF NEW JERSEY IS THE MOST APPROPRIATE
        TRANSFEREE FORUM.

All of the Actions should be transferred to the District of New Jersey. Among the factors that the Panel considers in determining the appropriate transferee court are: (1) the location of the witnesses, documents and other evidence; (2) centrality and ease of accessibility of the transferee forum; (3) the relevant experience of the transferee court; and (4) the docket conditions of potential transferee districts. See, e.g., In re Upjohn Co. Antibiotic "Cieocin" Prods. Liab. Litig., 450 F. Supp. 1168, 1171 (J.P.M.L. 1978) (transferring actions to district nearest to location of witnesses and documents that would inevitably be involved in pretrial proceedings). Consideration of all of these factors weighs in favor of transfer to the District of New Jersey.

A.  The District of New Jersey is Where the Most Witnesses and Documents
    are Located.

The cases identified in the Schedule of Related Actions should be transferred to the District of New Jersey for pretrial coordination or consolidation because a significant number of documents and corporate witnesses that are crucial to the case are located in New Jersey, where the primary solar power partner of Defendant is located.  In all but one of related actions, the agent-

11

partner of Defendant, Vision Solar LLC, was the corporation that sold the Defendant's loans along with selling the solar panel components. Vision Solar had its principal place of business at 511 Route 168, Blackwood, N.J 08012 and had systematic and continuous contacts with New Jersey, promoted its products in New Jersey, and had agents, sales representatives, corporate management and customer service representatives that were all located in New Jersey.

In addition, it is anticipated that many of the key Vision Solar witnesses will be from New Jersey as many of its policies and procedures likely emanated from its principal place of business there.  In addition, it is highly likely that New Jersey will be the source of documents related to Vision Solar's sale of Defendant's finance product.  Upon information and belief, this is where the heart of Defendant's operational scheme was effectuated as evidenced by documents which will be further sought through discovery including sales and training methodology, agreements between Defendant and Solar Vision, LLC and multiple former employees of Vision Solar who have significant knowledge of the practices and policies by which Defendant and Vision Solar partnered.

  B. The District of New Jersey is the Most Convenient and Accessible
    <u>Transferee Jurisdiction.</u>

The Panel weighs a forum's convenience and accessibility in selecting a transferee district. *See*, *e.g.*, <u>In re Acacia Media Tech. Corp. Patent Litig</u>., 360 F. Supp. 2d 1377, 1380 (J.P.M.L. 2005) (transferring cases to a "convenient and accessible district that is well equipped with the resources that this complex docket is likely to require."). The District of New Jersey is the most convenient venue and accessible transferee district for the Actions.

New Jersey is a transportation hub with a major international airport less than twenty minutes from the Courthouse in Newark, and numerous direct flights from Florida, California,

Virginia and the Midwest, as well as being a rail hub. Moreover, Connecticut is a mere car or train ride away.

      C. The District of New Jersey Has the Resources and the Experience to <u>Manage this Litigation.</u>

The District of New Jersey has the resources and experience to manage this litigation. *See, e.g.,* <u>In re Ins. Brokerage Antitrust Litig.</u>, 360 F. Supp. 2d 1371, 1373 (J.P.M.L. 2005) (finding that the District of New Jersey was "equipped with the resources" that the complex docket would require); <u>In re: Tropicana Orange Juice Mktg. & Sales Practices Litig.</u>, 867 F. Supp. 2d 1341, 1342 (J.P.M.L. 2012) (finding that the District of New Jersey had the resources for the MDL action). As of March 20, 2024, the District Court of New Jersey has full complement of 17 judges.[4]

The Panel regularly considers the experience of the transferee forum in managing complex litigation. *See* <u>In re Janus Mutual Funds Investment Litig.</u>, 310 F. Supp. 2d 1359, 1361 (J.P.M.L. 2002) (selecting a "transferee district with the capacity and experience to steer this litigation on a prudent course."). Here, the Panel should consider the expertise of the District of New Jersey in managing MDL actions. According to the Panel's statistics through July 2024, the District of New Jersey currently has 74,631 active MDLs and  has overseen 83,661 multidistrict litigations.[5] Many

---

[4] Toutant, Charles "Judge Confirmed by Close Margin:  New Jersey District Court Now has Full Bench" (March 20, 2024)  https://www.law.com/njlawjournal/2024/03/20/judge-confirmed-by-close-margin-new-jersey-district-now-has-full-bench/?slreturn=20240702105534#:~:text=Radzinschi%2FALM-,Judge%20Confirmed%20by%20Close%20Margin%3A%20New%20Jersey%20District%20Now%20Has,senior%20status%20in%20October%202023 (last accessed August 2, 2024).

[5]  *See*  https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-July-1-2024.pdf

other district courts have far less experience with multidistrict litigation.

CONCLUSION:

For all of the foregoing reasons, Plaintiffs respectfully request on Order granting Transfer

and Coordination in the District of New Jersey pursuant to 28 U.S.C. § 1407.

Respectfully Submitted,

DATED**:**  August 2, 2024                    NAGEL RICE, LLP

By:      \_\_\_/s/ Bruce H. Nagel\_\_\_\_
Bruce H. Nagel
Diane E. Sammons
103 Eisenhower Parkway
Roseland, NJ 07068
Tel: (973) 618-0400
Fax: (973) 618-9194
bnagel@nagelrice.com
dsammons@nagelrice.com

*Attorneys for Plaintiffs Neda Yarnall, Cheryl*
*Hibbard, Mark Hibbard, Madelene Funk,*
*Christoper Funk, Tatiana Mykyta Polanin*
*and Hector Chaverra*